## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| SHARON J. SMITH, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.:  7:10-CV-1395-RDP |
| | } | |
| TUSCALOOSA CITY BOARD OF | } | |
| EDUCATION, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This matter is before the court on Defendant's Motion for Summary Judgment (Doc. # 18) and Defendant's Motion to Strike Declaration of Linda Ellis (Doc. # 29).  Both Motions have been fully briefed.  (Docs. # 19, 26 and 30, and Doc. # 33).[1]

**I.     Facts**

Plaintiff Sharon Smith formerly worked for Defendant Tuscaloosa City Board of Education as a Speech/Language Pathologist ("SLP").  (Doc. 20-2 at 64; Doc. 20-5 at 30).

Plaintiff graduated from Auburn University in 1974 with a bachelor's degree in communicative disorders. (Doc. # 20-5  at 19-20).  Plaintiff received her master's degree in speech pathology from the University of Alabama in 1977. (*Id.* at 20).  Prior to working for Defendant, Plaintiff worked as an SLP in the Tallapoosa County school system for twenty four years. (*Id.* at 22). In 2005, she and her husband moved to Tuscaloosa, Alabama.  (Doc. # 1 at ¶ 11).

Plaintiff began working for Defendant Tuscaloosa City Board of Education during the 2005-06 school year. (Doc. # 27-6).  She was recruited by Deborah Anderson to work for the

---

[1] Although the court initially set these matter for oral argument, the court has concluded that it is appropriate to take these motions under submission without argument.

Tuscaloosa City School System.  (Doc. # 1 at ¶ 12).  Plaintiff was fifty-two years old when she was hired.  (Doc. # 20-5 at 30).

During her first school year with Defendant, Plaintiff worked at Skyland Elementary and Oakdale Primary Schools.  (Doc. # 1 at 14).   At the beginning of the 2006-07 school year, Plaintiff was assigned to work as an SLP at Oakdale Primary School and Woodland Forrest Elementary. (*Id.*).

Deborah  Anderson was born in 1953 (Doc. # 20-2 at 7), and has served as Special Education Director for the Tuscaloosa City Schools since 2002. (Doc. # 20-1  ¶2).  Prior to becoming Special Education Director, Anderson taught special education for sixteen years.  She served as a Special Education Supervisor for the Tuscaloosa City Schools immediately prior to being promoted to Director. (Doc. # 20-1 ¶3).

Anderson's duties as Special Education Director include overseeing staff development for special education teachers and para-educators and overseeing special education staff development for principals and general education teachers. (Doc. # 20-1 ¶2).  She develops the pre-school budget for special education. (Doc. # 20-1 ¶2).  Anderson oversees all aspects of the Special Education Department, including the determination of whether students are eligible to receive special education services, the completion of all state and federal reports concerning special education services, and the general administration of the Special Education Department. (Doc. # 20-1 ¶2).

Anderson also observes and monitors all employees in the Special Education Department and makes recommendations to the Superintendent concerning the hiring, retention, and non-renewal of employees in the department. (Doc. # 20-1 ¶2).  Based upon her education, training and experience, Anderson is  familiar with the knowledge and skills required of special education teachers and SLPs within the Tuscaloosa City Schools.  (Doc. # 20-1 ¶4).

2

SLPs employed by the Tuscaloosa City School System are responsible for accepting referrals for students who have speech and language difficulties, conducting meetings and conferences to review referrals, and determining whether referrals are valid. (Doc. # 20-1 ¶5).  They are also responsible for conducting assessments and determining eligibility. (Doc. # 20-1 ¶5).  If a student is eligible for speech and language services, then SLPs are responsible for writing the student's Individualized Education Plans ("IEP") and implementing the services contained therein. (Doc. # 20-1 ¶5).

Plaintiff was hired to replace former SLP Yvonne Espy. (Doc. # 20-1 ¶90.  Espy had served as an SLP for several years but, in Anderson's view, had not done a very good job in mastering the processes involved in the special education program, specifically the requirement that her paperwork be in order.  (Doc. # 20-1 ¶9).

Plaintiff's job duties included performing assessments on students to determine whether they were eligible for services, meeting with parents to get their permission to test, writing IEPs, writing progress notes on students, filing Medicaid billing on students who received services, performing hearing screenings, providing therapy to students with speech and language impairments, and meeting timelines and guidelines in accordance with applicable federal laws. (Doc. 20-5 pp. 35-38; Doc. 20-1 ¶5).

Plaintiff had prior experience as an SLP for the Tallapoosa County Schools. (Doc. # 20-5 p. 22).  According to Plaintiff, her duties in Tallapoosa County were easier than her duties in Tuscaloosa City Schools due to the fact that in Tallapoosa County, SLPs were encouraged to call their Special Education Coordinator or her secretary with questions. (Doc. # 20-5 p. 40).  Furthermore, she had a lower case load in Tallapoosa County. (Doc. # 20-5 pp. 38-40).

3

Anderson initially thought that Plaintiff would do a good job of mastering her caseload and implementing the processes of the Special Education Department due to her experience as an SLP in Tallapoosa County. (Doc. # 20-1 ¶10). However, throughout Plaintiff's employment Anderson observed issues which indicated to her Plaintiff's lack of mastery of the special education process. (Doc. # 20-1 ¶ 11). For example, Plaintiff had trouble entering, creating, and accessing student records in the Student Tracking Inventory ("STI") and the Special Education Tracking System ("SETS"), the state-wide database that tracks all information on special education students. (Doc. # 20-1 ¶12; Doc. # 20-5 pp. 47-48). On one occasion, Plaintiff completed an initial evaluation for a student who was actually being re-evaluated. (Doc. # 20-1 ¶14). On another occasion, Plaintiff sought to remove a student from special education services whom she thought was ineligible despite Anderson's direction to her that the plaintiff gather additional data to determine whether the student could remain eligible to receive special education services. (Doc. # 20-1 ¶15). On other occasions, Plaintiff requested information from special education staff members without providing to the staff members enough information for them to respond to her request. (Doc. # 20-1 ¶16).

Even during the third year of her employment, Plaintiff still had questions concerning the procedures for providing services to a student transferring from another system, and for accessing and entering data regarding her students. (Doc. # 20-1 Exh. 1 ¶19). Plaintiff also had questions about whether to hold a temporary IEP meeting, how to process Medicaid eligible students, what to do with the completed paperwork, and how to handle paperwork for students after they had been re-evaluated. (Doc. # 20-1 ¶18). She sent several emails to Special Education Records Secretary Patty Sprayberry and Special Education Secretary Linda Rice requesting assistance with and asking questions about her job duties. (Docs. # 20-6 and 21-1). In one email, the plaintiff stated that she

did not know whether to invite a mother to attend a meeting concerning a special education student who had behavior problems. (Doc. # 20-5 pp. 79-80; Doc. # 21-6 pp. 20-21).

Plaintiff also mis-keyed an IEP duration date, such that the duration was a calendar year rather than a school year. (Doc. # 20-5 at p.81; Doc. # 20-6 at 31).  On August 22, 2007, Plaintiff sent an email to Patty Sprayberry calling herself a "looney bird" in regard to her difficulty writing an IEP on a particular student.  (Doc. # 20-5 p. 95; Doc. # 20-7 p. 7).  In September 2007, Plaintiff sent an email to Special Education Curriculum Specialist Mamie Daniels to clarify the procedure for enrolling a student without waiting the required waiting period to receive services.  (Doc. # 20-5 p. 102; Doc. 20-6 p. 47).  Plaintiff also sent a number of e-mails to Patty Sprayberry asking to whom she should send paperwork.  (Doc. # 20-5 pp. 86, 104; Doc. # 20-6 pp. 35, 50).  On October 2, 2007, Plaintiff e-mailed Sprayberry acknowledging that she had made "many mistakes" and stating that she did not "want to go out with a rep. [reputation] like Mrs. Espy!" (Doc. # 20- 5 pp. 106-107; Doc. # 20-7 p. 9).  On October 29, 2007, Plaintiff sent yet another e-mail to Sprayberry stating: "I am sorry the paperwork is not complete. . . . I have no excuse." (Doc. # 20-5 pp. 108-109; Doc. # 20-6 p. 53).  In December 2007, Plaintiff acknowledged in an e-mail Sprayberry that she had sent a folder to her prematurely.  (Doc. # 20-6 p. 56).

In a December 17, 2007 exchange of e-mails with Sprayberry regarding a certain student, Plaintiff stated, in part "I probably did the wrong thing . . . . I don't know" and "I feel like such a dummy." (Doc. # 20-5 p. 111; Doc. # 20-6 p. 57, 59).  Regarding the same child, Plaintiff e-mailed Special Education Supervisor Penny Pake and apologized if the paperwork was incorrect.  (Doc. # 20-6 p. 59).

On October 23, 2007 and December 11, 2007, the SLPs met with Anderson to express their concerns about their caseloads, the paperwork required of them, and the fact that they were feeling overwhelmed. (Doc. # 20-5 at pp. 125-35). Plaintiff expressed her concern to Anderson that the SLPs' caseloads were so heavy, it was interfering with their ability to properly serve the children pursuant to their IEPs. (Doc. # 20-5 at pp. 125-35).

Despite being one of the more experienced SLPs, Plaintiff continued to have many questions throughout her employment. Although other SLPs asked questions and had problems, Anderson perceived Plaintiff to have more than her share. (Doc. # 20-1 at ¶20; Doc. # 20-5 at 132). Throughout her employment, Plaintiff's immediate supervisors, Mamie Daniels and Penny Pake, expressed their concerns to Anderson that Plaintiff was having problems with her paperwork and the special education eligibility process. (Doc. # 20-1 ¶21).

During Plaintiff's third year of employment, Sprayberry voiced concerns to Anderson that Plaintiff frequently asked her questions regarding how to perform her (Plaintiff's) job duties. (Doc. # 20-1 p. ¶19). Although some of Plaintiff's former co-workers disagree, in Anderson's view, Plaintiff should have already known the answers to those questions and should not have been asking such questions of a secretary. (Doc. # 20-1 ¶19; Doc. # 27-1 ¶ 6; Doc. 26-2 ¶¶ 5, 12, 14 and 18).

Toward the end of the 2007-2008 school year, Anderson consulted with Lucile Prewitt and Allison Sherrill, the principals of the schools where Plaintiff was assigned, to determine whether they should recommended that Plaintiff's contract be renewed for the following school year. (Doc. # 20-1 ¶22). Based upon the many performance problems they perceived Plaintiff to have demonstrated, it was determined that a recommendation should be made to the Superintendent that Plaintiff's contract should not be renewed at the end of the 2007-2008 school year. Exh. 1, p. 7, ¶22. Dr.

6

Prewitt and Anderson had reached the same conclusion at the end of the previous year; but they nevertheless agreed that Plaintiff should be given another year (and be given another chance to show improvement).  (Doc. # 20-1 ¶22; Doc. # 20-3 ¶9).

At the end of the 2008 school year, when the decision was made to recommend that Plaintiff's contract not be renewed, Anderson did not recall Plaintiff ever complaining to her that the Tuscaloosa City Board of Education was not meeting the needs of its special education or disabled students.  (Doc. # 20-1 ¶24).

After Plaintiff's contract was non-renewed, she asked Dr. Prewitt to assist her in finding new employment.(Doc. # 27-3 ¶13).  Prewitt wrote a recommendation letter on Smith's behalf.  The letter stated in relevant part:

> ...Sharon is a hard-working individual with superb organizational skills.  She also has a superb work ethics [sic].
> ...
> At a personal level, Sharon is a well disciplined [sic], industrious person with a pleasant personality.  She goes over well [sic] beyond the job requirements, in both quantity and quality.

(Doc. # 27-5).

Prewitt testified that her recommendation had nothing to do with, and was not a comment on, Plaintiff's ability to successfully initiate and complete the processes required of SLPs in the Special Education Department of the Tuscaloosa City Schools. (Doc. # 20-3 ¶13).  In all of the evaluations Prewitt completed, and which were based upon observation of Plaintiff in the classroom setting, Prewitt gave Plaintiff good scores.  (Doc. # 20-3 ¶¶ 5-7).  However, Anderson testified that these documents are not reflective of Plaintiff's performance outside the classroom.  (Doc. # 20-3 ¶¶ 5-8).

III.     **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

IV.     **Discussion**

A.     **Plaintiff's Claims**

Plaintiff asserts the following claims against Defendant:

1.       Count One - Disparate Treatment Age Discrimination Under the ADEA;

2.       Count Two - Retaliation Under the Americans with Disabilities Act; and

3.       Count Three   - Retaliation Under the First Amendment.

In her Complaint, Plaintiff asserted a claim, Count Four, under Alabama Code § 11-43A-45. In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff concedes that this claim is due to be dismissed. (Doc. # 26 p. 33, n.6). After careful review, the court concludes that Defendant's summary judgment motion is due to be granted for the following reasons.

## B.     Plaintiff's Disparate Treatment Age Discrimination Claim

### 1.     Plaintiff Has Failed To Establish A Prima Facie Case

The ADEA makes it unlawful to discriminate on the basis of age against an employee who is at least 40 years old. *See* 29 U.S.C. §§ 623(a), 631(1).

Where a plaintiff has submitted solely circumstantial evidence of discrimination, courts generally s employ the *McDonnell–Douglas* framework for ADEA claims. *See Turlington v. Atlanta Gas Light Co.*, 135 F .3d 1428, 1432 (11th Cir. 1998). Under the *McDonnell–Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Crawford*, 482 F.3d at 1308. Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer does so, the presumption of discrimination is rebutted, and the burden of production shifts back to the plaintiff to offer evidence that the employer's alleged reason was pretext for unlawful discrimination. *Id.*

The employer's burden under the second prong of the test is "exceedingly light" and merely requires that the employer proffer a legitimate nondiscriminatory reason. *Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994). "To meet his burden under the third part of the test, the plaintiff must disprove all legitimate nondiscriminatory reasons proffered by the employer."

*Bradley v. Pfizer, Inc.*, 2011 WL 3962824, * 2 (11th Cir. 2011) (citing *Crawford*, 482 F.3d at 1308). "Proof of discriminatory animus does not prove pretext unless it disproves the legitimate nondiscriminatory reason proffered by the employer." *Bradley*, 2011 WL at * 2 (citing *Crawford*, 482 F.3d at 1309).

In *Gross v. FBL Fin. Servs., Inc.*, the Supreme Court held that a plaintiff bringing an age discrimination claim under the ADEA must show that age was the "but-for" cause of the complained of employment action. *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2350 (2009). In other words, the plaintiff must show "that age was the 'reason' that the employer decided to act." *Gross*, 129 S.Ct. at 2343.

For purposes of summary judgment, Defendant concedes that Plaintiff can establish a prima facie case of age discrimination by showing that: she was a member of a protected age group, that she was subject to an adverse employment action (the non-renewal of her contract), that she met the qualifications of the job, and that she was replaced by a younger individual. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). (Doc. # 19 p.20, n. 1). Therefore, the court analyzes Defendant's articulated reasons for the decision and the issue of pretext.

> **2.      Defendant Has Articulated Legitimate Non-Discriminatory Reasons for Not Renewing Plaintiff's Contract**

Defendant has presented evidence that Plaintiff's contract was not renewed due to her performance as related to the paperwork and documentation aspects of her job duties. (Doc. # 19 pp. 21-22).

### 3.    Plaintiff Has Failed to Establish that Defendant's Articulated Reasons for her Non-Renewal Were A Pretext for Age Discrimination

Where, as here, a "defendant articulates one or more [legitimate, non-discriminatory] reasons [for the challenged employment decision], the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. Al Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997) (citations omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024-25 (citing *Combs*, 106 F.3d at 1529).

Here, Defendant has articulated legitimate, nondiscriminatory reasons for not renewing Plaintiff's contract; therefore, the court turns to the "focused" inquiry concerning whether Plaintiff can show pretext. *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001). "A plaintiff may not recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet the reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Hammock v. Nexcel Synthetics, Inc.*, 201 F. Supp. 2d 1180, 1187 (N.D. Ala. 2002) (quoting *Chapman*, 229 F.3d at 1029 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000) and *Combs*, 106 F.3d at 1541-43))). "It is not the court's role to second-guess the wisdom of an employer's decisions as long

11

as the decisions are not [discriminatory]." *Alexander*, 207 F.3d at 1341; *see also Combs*, 106 F.3d at 1541-43.   A plaintiff may establish pretext in at least two ways: by showing that (1) "a discriminatory reason more likely motivated" a decision or (2) "the employer's proffered reason is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

In Plaintiff's response to Defendant's articulated reasons, she does not dispute the identified issues.  Rather, she asserts that her performance was not unusual and were indeed shared by other SLPs.  (*See, generally,* Doc. # 26 pp. 4 - 11).   In support of this position, Plaintiff submitted the declarations of other SLPs working in the Tuscaloosa City School System to the effect that they did not perceive deficiencies in Plaintiff's work performance, and that the workloads of the SLPs in the Tuscaloosa City School System are onerous.  (Docs. # 26-1 and 26-2).

Essentially, Plaintiff has done nothing to attack Defendant's reasons for her non-renewal other than disagree with them.  As the court stated in *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997):

> The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance. *Billet v. CIGNA Corp.*, 940 F.2d 812, 818-22 (3rd Cir. 1991). *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3rd Cir. 1995); *Gray v. U. of Arkansas at Fayetteville*, 883 F.2d 1394, 1401 (8th Cir. 1989); *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (perception of decisionmaker, not employee, is relevant).

*Holifield*, 115 F. 3d at 1565.  Plaintiff has presented nothing to show that Debbie Anderson, who recommended that Plaintiff's contract be non-renewed, did not in good faith believe that Plaintiff's performance suffered from the deficiencies she articulated.

Plaintiff argues that Lucile Prewitt's "recommendation" letter and her favorable reviews of Plaintiff, based upon observation of Plaintiff in the classroom setting, show that Plaintiff's

performance was not, in fact, deficient. Although these items at first blush may appear inconsistent with Plaintiff exhibiting poor performance, Defendant has not taken the position that all aspects of Plaintiff's performance was weak. The performance shortfalls noted by Defendant have to do with paperwork and documentation issues, rather than actual services provided to students. Prewitt's affidavit clarified the context under which these documents were prepared. And they are not inconsistent with the performance deficiencies identified by Anderson.

To survive a properly supported motion for summary judgment, Plaintiff must "meet [Defendants'] reason head on and rebut it," and she "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030 (citing *Alexander*, 207 F.3d at 1341). Plaintiff's evidence of alleged pretext, in the form of co-worker affidavits and the reviews and recommendations from Prewitt, does nothing more than quarrel with the wisdom of Anderson's determination that there were deficiencies in certain aspects of her performance. This is insufficient to establish pretext.

Because Plaintiff has failed to establish that the articulated reasons for the non-renewal of her contract were a pretext for age discrimination, Defendant is entitled to summary judgment on this claim.

### C.      Plaintiff's Retaliation Claim Under the ADA

#### 1.      Plaintiff Has Failed To Establish A Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must present evidence showing that (1) she engaged in statutorily protected expression, (2) her employer took action that would have been materially adverse to a reasonable employee, and (3) some causal relation existed between the two events. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (announcing

"materially adverse" element); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

###### a.      Plaintiff Arguably Engaged In Conduct Protected By the ADA

The ADA prohibits retaliatory conduct against an employee when the employee either opposes illegal conduct (opposition) or participates in any proceedings regarding a claim of discrimination (participation). 42 U.S.C. § 12203(a).  Under the ADA's "opposition clause," "[n]o person shall discriminate against an individual because such individual has opposed any act or practice *made unlawful by this chapter*." 42 U.S.C. § 12203(a) (emphasis added). This anti-retaliation provision is similar to Title VII's prohibition on retaliation. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir.1997).

To establish that the plaintiff engaged in "statutorily protected activity," it is sufficient that she have a "good faith, objectively reasonable belief that h[er] activity [was] protected by the statute."*Clover v. Total Sys. Servs., Inc.*, 157 F.3d 824, 827 (11th Cir. 1998)) (employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

Plaintiff's alleged protected conduct here was her expression of belief to Anderson that the SLP's caseload was interfering with their ability to serve the students and provide the services to them required under their IEPs.  IEPs are provided to disabled students under the auspices of the Individuals with Disabilities Education Act (IDEA).  Although the IDEA is not the ADA, for purposes of summary judgment only, the court assumes without deciding that Plaintiff could have

reasonably believed that such students were also protected under, and thus her complaint expressed opposition to, conduct that was illegal under the ADA.

> **b.** **Plaintiff Suffered A Materially Adverse Employment Action**

Without question, the non-renewal of Plaintiff's contract is the functional equivalent of the termination of her employment; therefore Plaintiff has shown that she was subjected to an actionable adverse employment action.

> **c.** **Plaintiff Cannot Establish a Causal Relation Between Her Alleged Protected Expression and the Non-Renewal of Her Contract**

To establish retaliation, and the causal relation between the adverse employment action and the protected activity, a plaintiff must generally show at a minimum that the decision maker was aware of the protected conduct at the time of the adverse employment action. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression... ."). Defendant argues that Anderson was not aware of – and/or did not recall – Plaintiff's alleged protected expression.  However, drawing all inferences in favor of the non-moving party, Plaintiff, as the court must, the trier of fact could infer that Anderson was aware of Plaintiff's alleged protected expression.

To be sure, Plaintiff has presented no evidence of causation other than Anderson's knowledge of the alleged protected expression and the fact that the alleged protected expression took place before Plaintiff's contract was non-renewed.  Thus, Plaintiff relies merely on timing for the causal connection between these two events.

Based upon Plaintiff's declaration, the meeting at which Plaintiff allegedly engaged in protected conduct occurred on or about October 23, 2007.  (Doc. # 27-3 ¶¶ 8, 10).  However, it was not until "towards the end of the 2007-2008 school year," that Anderson determined that the recommendation should be made not to renew Plaintiff contract.  (Doc. # 20-1 ¶ 22).  This is a time lapse of at least five months, and possibly longer, between the alleged protected conduct and the adverse employment action.  For the reasons explained below, such a lengthy time lapse between the purportedly protected conduct and the adverse action is simply insufficient to establish the requisite causal connection.

The Supreme Court has held that to establish a causal connection, "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action ... must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Generally, a temporal proximity of one month or less satisfies this standard. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding a timeframe of seven weeks sufficiently proximate to create a causal nexus for establishing a prima facie retaliation claim); *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n. 30 (11th Cir. 2003) (noting that a period of one month between the protected activity and the adverse action can establish the causal connection). *Cf. Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that a three-month period between the filing of an internal complaint and the adverse employment action does not satisfy the temporal proximity causation standard); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation).

16

Apparently, recognizing the problematic timing issues in this case, Plaintiff argues that, because she was a contract employee and could not be terminated at will, this overcomes any hurdle established by the Eleventh Circuit's decisions on timing.  However, the undisputed evidence in the Rule 56 record establishes that the process of decision to non-renew Plaintiff's contract did not begin until "[t]owards the end of the 2007-2008 school year."  Thus, even timing is not on Plaintiff's side and she is unable to establish a causal connection between her alleged protected conduct and the alleged retaliatory conduct.  Therefore, Plaintiff cannot establish a prima facie case on her retaliation claim and Defendant is entitled to summary judgment.

      **2.**      **In Any Event, Plaintiff Has Failed to Establish that Defendant's Articulated Reasons for her Non-Renewal Were A Pretext for Retaliation**

Even if Plaintiff could establish a prima facie case of retaliation, for the same reasons discussed above under Section IV(B)(3), Plaintiff has failed to establish that Defendant's reasons for her non-renewal were a pretext for retaliation.  "A reason is not pretext for [retaliation] 'unless it is shown both that the reason was false, and that [retaliation] was the real reason.'"  *Brooks v. County Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

      **D.**      **Plaintiff's First Amendment Retaliation Claim**

      **1.**      **Plaintiff Has Failed To Establish A Prima Facie Case**

It is well established in this circuit that, for a public employee to establish a prima facie case of First Amendment retaliation, she must show: 1) that the speech can be fairly characterized as relating to a matter of public concern, 2) that her interests as a citizen outweigh the interests of the State as an employer, and 3) that the speech played a substantial or motivating role in the

17

government's decision to take an adverse employment action. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). If the plaintiff can establish these elements, the defendant is given the opportunity to rebut the presumption of retaliation by proving that it would have made the same decision even if the speech at issue had never taken place. *Id.* at 1566.

Although Defendant argues that Plaintiff "did not speak," meaning her deposition testimony does not support the conclusion that she spoke on any matter specifically, for purposes of summary judgment we must view the evidence in the record in the light most favorable to Plaintiff, the non-moving party. Therefore, for purposes of Rule 56, the court assumes that Plaintiff made the statements she alleges she made, *i.e.,* she expressed her concern to Anderson that the SLPs' caseloads were so heavy that it was interfering with their ability to properly serve the children pursuant to their IEPs. (Doc. # 20-5 at pp. 125-35).

### 1. Plaintiff's Speech Was Not On A Matter of Public Concern

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "Following *Garcetti*, [the Eleventh Circuit] has modified the analysis of the first step of the *Pickering*[2] test for analyzing alleged government employer retaliation to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th

---

[2] *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

Cir. 2007) citing *D'Angelo v. School Bd. of Polk County, Fla.*, 497 F.3d 1203, 1209 (11th Cir. 2007)).

If a government employee was speaking as an employee, there no First Amendment issue, and the constitutional inquiry ends with no consideration of the *Pickering* test.  *Boyce*, 510 F.3d at 1342 (citing *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647-48 (7th Cir.2006) (recognizing that "[o]nly when a government employer penalizes speech that a plaintiff utters 'as a citizen' must the court consider" the *Pickering* analysis)).  "'A court must therefore discern the purpose of the employee's speech-that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee.'"  *Boyce*, 510 F.3d at 1343 (quoting *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993)).  "Deciding whether a government employee's speech relates to his or her job as opposed to an issue of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Boyce*, 510 F.3d at 1343 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Here, the form and context of Plaintiff's speech runs counter to her argument that the speech is entitled to constitutional protection. The discussion regarding the SLPs' workloads was made in an informal meeting of the SLPs with their supervisor, Anderson.  (Doc. # 2-5 p.125).  Even her own testimony about the meeting reveals that it was not made in any type of forum to address public concerns.  "It was just a meeting with Ms. Anderson to discuss our concerns."  (Doc. # 2-5 p.128).  During this meeting, the Rule 56 record suggests that there was some discussion about taking the issue to a more public forum.  (Doc. # 2-5 p.130).  The main thrust of the discussion was their caseloads and the fact that they felt the paperwork required of them was overwhelming.  (Doc. # 2-5 p.133-34).

"'[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is "whether the purpose of the [the plaintiff's] speech was to raise issues of public concern."'" *Boyce*, 510 F.3d at 1344 (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (in turn quoting *Morgan,* 6 F.3d at 754); *see also Renfroe v. Kirkpatrick*, 722 F.2d 714, 715 (11th Cir.1984) (per curiam) ("[P]laintiff's reference to the students' welfare during her oral presentation to the Board is not sufficient to bring her grievance within the rubric of matters of 'public concern.'").

As was true of the plaintiffs' speech in *Boyce,* the record here reveals that Plaintiff's speech, although arguably intermingled with issues of services to students,[3] "was not intended to address matters of public concern from the perspective of a citizen." *Boyce*, 510 F.3d at 1344-45 (citing *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993) (recognizing that "[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight" in turn citing *Connick*, 461 U.S. at 154))). Like the plaintiffs in *Boyce*, Plaintiff here was complaining to her supervisor that her caseload should be reduced, rather than attempting to raise public awareness of the potential adverse effect on students.  The primary purpose of Plaintiff's speech was as an employee to improve her own work environment.  "Because [Plaintiff] spoke as [a] government employee[] about [her] job[] and not as [a] citizen[], she has 'no First Amendment cause of action based on [her] employer's reaction to the speech,' and there is no need to engage in the *Pickering* balancing analysis." *Boyce*, 510 F.3d at

---

[3]   The court acknowledges that, if the speech had occurred in a different context, the effectiveness of the students' IEPs may be an issue of public concern, even if it was also intertwined with a discussion of an SLP's job duties.

1346-47 (quoting *Garcetti*, 547 U.S. 418).  Therefore, Defendant is entitled to summary judgment on Plaintiff's First Amendment claim.

### 2.      Plaintiff Failed To Establish Causation

Even if Plaintiff had could show that her speech was made as a citizen on an issue of public concern, the court concludes that she has not shown that it was a substantial or motivating role in the decision to non-renew her contract.  This is the case for the same reasons discussed above in Section IV(C)(1)(c).

## V.      DEFENDANT'S MOTION TO STRIKE

Defendant's Motion to Strike Declaration of Linda Ellis (Doc. # 29) seeks to preclude Ms. Ellis's declaration on various grounds.  However, the information contained in her declaration is largely irrelevant to the issues raised by Defendant's motion for summary judgment and was not cited by the court in its analysis above.  Because the court is fully able to consider relevant matters and disregard irrelevant matters as it deems appropriate, the motion to strike is due to be denied.

## VI.      CONCLUSION

For the reasons stated above, Defendant's Motion For Summary Judgment (Doc. # 18) is due to be granted, and Defendant's Motion to Strike Declaration of Linda Ellis (Doc. # 29) is due to be denied.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this ____13th____ day of October, 2011.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE